Bryan Hurlbutt (ISB # 8501)
Andrew Hursh (ISB # 12644)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 730-6961 (Hurlbutt)
(208) 268-5210 (Hursh)
bhurlbutt@advocateswest.org
ahursh@advocateswest.org

Susan Jane M. Brown (OSB #054607) *Pro Hac Vice Pending*
SILVIX RESOURCES
4107 NE Couch St.
Portland, OR 97232
(503) 680-5513
sjb@silvix.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF IDAHO**
**CENTRAL DIVISION**

| | |
|---|---|
| **IDAHO CONSERVATION LEAGUE, GREAT BURN CONSERVATION ALLIANCE**, and **MONTANA WILDLIFE FEDERATION**,<br><br>*Plaintiffs,*<br><br>vs.<br><br>**UNITED STATES FOREST SERVICE**,<br><br>*Defendant.* | Civ. Case No. 3:26-cv-673<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Violations of the National Forests Management Act of 1976, 16 U.S.C. §§ 1600 et seq.; National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.; and Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.) |

## INTRODUCTION

1. The Nez Perce-Clearwater National Forests (the Forests) in Idaho are one of the crown jewels of the National Forests System.

2. Encompassing more than four million acres, the Forests are characterized by rugged mountain ranges; Wild, Scenic, and Recreational Rivers; vast mixed conifer Forests punctuated by open meadows, grasslands, and deciduous glens; and abundance of recreational opportunities.

3. The Forests are also home to iconic but at-risk wildlife such as mountain goats and wolverine that depend on high elevation habitat that is generally free from human disturbance – particularly from motorized vehicles.

4. One of the most unique and cherished features of the Forests is the Great Burn: in 1910, wildfires burned more than three million acres of forestland in less than 3 days, dramatically altering the landscape in ways that are still evident today.

5. Today, the Great Burn ecosystem is a unique and ecologically important place. Spanning parts of the Nez Perce-Clearwater and the neighboring Lolo National Forest, the Great Burn ecosystem offers abundant native wildlife habitat, and provides for crucial wildlife passage connecting the Crown of the Continent Ecosystem – a 10-million-acre region in the northern Rocky Mountains where Montana, Alberta, and British Columbia meet – and the Selkirk-Cabinet-Yaak Ecosystems with Central Idaho's wildlands and the Greater Yellowstone Ecosystem.

6. In the heart of the ecosystem, the Great Burn Recommended Wilderness straddles approximately fifty miles along the Idaho and Montana state line in the Northern Bitterroot Mountains.

7. The Great Burn Recommended Wilderness contains specialized habitat for a range of species including mountain goats and wolverine, serves as an important corridor for wildlife migration and dispersal along the Bitterroot Divide, and offers superlative opportunities for quiet recreation in a wild, untrammeled landscape.

8. The United States Forest Service is the custodian of these remarkable public resources and has a statutory obligation to create and revise land management plans – known as "Forest plans" – to guide the management of the Forests and their resources using the best available scientific information.

9. Although the law requires the Forest Service to revise Forest plans every 15 years, the agency rarely, if ever, meets this requirement. Instead, in practice, revising the Forests' land management plan is a once-in-a-lifetime opportunity to engage the public and others to set priorities and desired outcomes for land management, and importantly, to ameliorate "stressors" or threats to wildlife and wild places on the Forests.

10. On the Nez Perce-Clearwater National Forests, wildlife like mountain goats and wolverine and wild places such as the Great Burn face serious threats. Most significantly, they are threatened by climate change and winter motorized recreation. Both stressors are increasing in their magnitude and intensity.

11. In early 2025, for the first time in almost 40 years, the Forest Service revised the Forest Plan for the Nez Perce-Clearwater National Forests. Rather than utilize the best available scientific information to conserve mountain goats and wolverine and protect the Great Burn from these known and escalating threats, the Forest Service shirked its procedural legal obligations and *reduced* protections for mountain goats, wolverine, and the Great Burn.

12. Although Plaintiffs Idaho Conservation League, Great Burn Conservation Alliance, and Montana Wildlife Federation attempted to work with the Forest Service to address these very issues during the revision process, the agency refused to change course. This litigation followed.

**JURISDICTION AND VENUE**

13. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (further necessary or proper relief). This action arises under the laws of the United States, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*; and the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq*. An actual, justiciable controversy exists between Plaintiffs and Defendant.

14. Venue in this Court is proper under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. The national forestlands at issue in this case are located in this judicial district. Plaintiff Idaho Conservation League has offices within this district.

15. This case is properly filed in the Central Division pursuant to Local Rule 3.1 because most of the federal land at issue in this case is located in Clearwater, Shoshone, and Idaho Counties, Idaho, in this Division. The federal official responsible for the implementation of the Revised Forest Plan at issue in this case is located in Lewis County, Idaho, which is located in this Division.

16. Plaintiffs have exhausted all available and required administrative remedies. Plaintiffs satisfy the requirements for Article III standing through their members and supporters who are adversely affected by the decision challenged in this action. Plaintiffs have significant, concrete interests in protecting and enjoying wildlife and public lands on the Nez Perce-Clearwater

National Forests. Those interests are and will continue to be harmed by the Forest Service's Revised Plan, and a favorable ruling from this Court will redress those harms. This matter is ripe for judicial review.

**PARTIES**

17. Plaintiff IDAHO CONSERVATION LEAGUE (ICL) is an Idaho non-profit organization based in Boise, Idaho, with additional offices in Sandpoint, McCall, and Ketchum. Founded in 1973, ICL is dedicated to protecting Idaho's air and water quality, fish and wildlife, and public lands. ICL has over 7,000 members who care deeply about Idaho's public lands, including the Nez Perce-Clearwater National Forests, and the rivers, wildlands, and biodiversity therein. ICL's members and supporters use the Forests for fishing, hunting, hiking, skiing, snowshoeing, camping, and more. Additionally, ICL members and supporters value the Nez Perce-Clearwater for its abundant fish and wildlife, forests, clean water, and quiet spaces.

18. ICL engages in collaboration with agencies and other public stakeholders, conducts public outreach and education, and engages in professional advocacy to achieve its mission. The organization has a long history of advocating for the protection of roadless areas, recommended wilderness areas, free-flowing rivers, and fish and wildlife habitat on the Forests. Staff and ICL supporters have been involved throughout the entire process to revise the Land Management Plan for the Forests by engaging with the Clearwater Basin Collaborative, submitting substantive written comments, attending public meetings, and filing administrative objections. The Revised Plan will irreparably harm ICL's interests by reducing protections for roadless areas, recommended wilderness areas, fish and wildlife, and water quality.

19. Bradley Smith is an ICL member and its Interim Executive Director. Mr. Smith has been an ICL member since 2005. Independently of his employment with ICL, Mr. Smith regularly

visits the Nez Perce-Clearwater National Forests to hike, backpack, fish, observe wildlife, photograph natural landscapes, and experience solitude and wilderness character. Mr. Smith relies on ICL to represent his personal interests as a member in protecting the public lands, native wildlife, and recreational opportunities that he uses and enjoys.

20. Mr. Smith chooses to visit these locations because they provide opportunities for quiet, human-powered recreation in a large, undeveloped landscape that supports mountain goats, wolverines, and other native wildlife. Motorized noise, visible vehicle tracks, encounters with motorized users, and displacement of wildlife would diminish his opportunities for solitude, wildlife observation, photography, and primitive recreation. The Revised Plan removed plan-level Recommended Wilderness protection from portions of the Great Burn that Mr. Smith has used and intends to use again, and it identified those lands as suitable for potential future over-snow vehicle ("OSV") use. The Revised Plan also failed to provide plan components that Mr. Smith believes are necessary to protect mountain goats and wolverines from human disturbance and other stressors. These decisions materially increase the risk that the conditions Mr. Smith personally uses and enjoys will be degraded.

21. Plaintiff GREAT BURN STUDY GROUP, doing business as GREAT BURN CONSERVATION ALLIANCE ("GBCA"), is a Montana nonprofit organization based in Missoula, Montana. For more than fifty years, GBCA has worked to protect and conserve wildlands in the Northern Bitterroot Mountains of western Montana and northern Idaho, including the Great Burn and portions of the Nez Perce-Clearwater National Forests: during this time, GBCA has been the only organization dedicated solely to the protection and stewardship of this area. GBCA is supported by approximately 1,300 individuals, most of whom live in Montana and Idaho.

22. Consistent with its mission and on behalf of its supporters, GBCA provides advocacy, education, and on-the-ground stewardship within its mission area, and routinely comments and participates in available public processes related to the Great Burn. GBCA and its supporters use the Forests for a variety of pursuits, including education, trail stewardship, hiking, backpacking, photography, wildlife watching, botanizing, research, and other recreational, personal, and professional activities. The interests of GBCA and its supporters will be irreparably impaired if the Revised Plan is implemented without following the procedures required by federal environmental laws.

23. GBCA serves a specialized segment of the community through its 1,300 supporters who include local residents, recreationists, and outdoor and conservation professionals that regularly visit, study, steward, and depend on the Forests. Supporters are identified and engaged through volunteer and donor registration, program participation, events, and outreach; maintain an ongoing relationship with GBCA by contributing their time, funding, expertise, additional resources, and engage in hands-on participation in programs and projects on the Forests; provide direction and feedback regarding organizational priorities on the Forests and surrounding areas; and exercise meaningful influence over GBCA's direction through discussion with GBCA leadership, appointments to leadership and advisory roles and boards, participate in transparent reporting and leadership accountability practices, and engage in additional feedback mechanisms.

24. GBCA's mission to protect and conserve wildlands in the Northern Bitterroot Mountains in western Montana and northern Idaho, including the Forests, is directed to serve and advance the interests of supporters by focusing GBCA's advocacy, education, and stewardship on the

areas supporters use and value, the resources they study and depend on, and the recreational, educational, professional, and personal activities they undertake on the Forests.

25. Hayley Connolly-Newman is GBCA's Executive Director. In that role, Ms. Connolly-Newman directs GBCA's advocacy, education, stewardship, and public engagement activities throughout the Northern Bitterroot Mountains, including the Great Burn and the Nez Perce-Clearwater National Forests. Ms. Connolly-Newman regularly communicates with GBCA's supporters regarding their use of, and concerns about, the Great Burn; incorporates their information and priorities into GBCA's organizational work; organizes or participates in educational and stewardship activities in the area; and represents GBCA and its supporters before the Forest Service and other public agencies.

26. Ms. Connolly-Newman personally uses and enjoys the Great Burn for hiking, backpacking, skiing, horseback riding, and wildlife observation. She has visited Kelly Creek, Blacklead, Kid Lake, Rhodes Peak, and traveled extensively along the stateline trail, including most recently in October 2026, when she rode her horses from Hoodoo Pass along the Stateline Trail to Dalton Lake overlook. On this trip Ms. Connolly-Newman observed mountain goats, encountered a grouse hunter, and experienced the Great Burn's exceptional opportunity for quiet, primitive recreation. Ms. Connolly-Newman currently plans to return to Kid Lake in the Great Burn with her young daughter in summer 2027 so that she can experience the area's exceptional qualities for quiet recreation, undeveloped landscapes, and wildlife viewing. Ms. Connolly-Newman's personal interest in visiting and enjoying the Great Burn exists independently of her employment with GBCA, and she intends to continue using the area regardless of her position with the organization.

27. Ms. Connolly-Newman visits the Great Burn to experience quiet, solitude, wilderness character, and the opportunity to observe and learn about native wildlife and intact ecosystems. Motorized noise, vehicle encounters, visible vehicle tracks, diminished solitude, and displacement or decline of mountain goats, wolverines, and other native wildlife would directly impair her recreational, aesthetic, educational, and professional use of the particular places she visits. The removal of portions of the historic Great Burn Recommended Wilderness Area from Recommended Wilderness management and the identification of those lands as suitable for potential future OSV use materially increase the risk that those conditions will be degraded. The failure to designate mountain goats as a Species of Conservation Concern and to adopt adequate plan components addressing disturbance to mountain goats and wolverines likewise increases the risk of harm to the wildlife and habitat Ms. Connolly-Newman seeks to observe, study, and protect.

28. Ms. Connolly-Newman participated extensively in the Forest Plan revision on behalf of GBCA and its supporters. She submitted comments on the 2020 Draft Forest Plan and Environmental Impact Statement addressing the proposed reduction of the Great Burn Recommended Wilderness Area, potential future OSV use, and the need for plan components protecting mountain goats and wolverines. Ms. Connolly-Newman also served as GBCA's lead objector to the 2024 Draft Record of Decision, Revised Plan, and Final Environmental Impact Statement.

29. Brian Christianson has been an active GBCA supporter since 2017 and has served on GBCA's Board of Directors since 2024. As a board member, Mr. Christianson participates in GBCA's governance, outreach, and fundraising and helps direct the organization's activities. Mr. Christianson is also a professional nature photographer, educator, and storyteller whose work

focuses on wilderness and wildlife. Photographs he has taken in the Great Burn have appeared in prints, calendars, and gallery exhibitions, including his 2024 “Modern Wilderness” exhibition in Missoula.

30. Mr. Christianson regularly hikes, backpacks, camps, skis, and photographs wildlife and wild landscapes on the Forests, particularly in the Great Burn. In September 2025, he completed a three-day backpacking trip from the Blacklead Trailhead to the Crooked Fork Trailhead, visiting lakes, ridges, and high-elevation habitat on the Forests. Mr. Christianson returned to the Great Burn on September 1-2, 2026, when he visited the Heart Lake basin to photograph the area’s stunning high alpine lakes and mountain goat herd. On that trip, Mr. Christianson positively identified half a dozen nannies and kids on the cliffs above Pearl Lake. Mr. Christianson next plans to return to the Blacklead Mountain area in July 2027 to photograph the mountain goat herd on the southern end of the Great Burn.

31. During three winter photography trips in 2018 and 2019, Mr. Christianson encountered snowmobile tracks, engine noise, and snowmobile users within areas then managed as recommended wilderness and closed to motorized use. Those encounters directly diminished the solitude, quiet, wildlife photography opportunities, and undeveloped setting that were the purpose of his visit. Mr. Christianson has also used game cameras and other photographic methods to document mountain goats and other native wildlife in the Great Burn. Additional motorized use and associated wildlife disturbance would impair his recreational and aesthetic enjoyment of the places he visits and reduce his opportunities to photograph wildlife and undeveloped landscapes. Because Mr. Christianson’s professional work includes photographing and interpreting the Great Burn, degradation of these conditions would also impair his

professional activities. His injuries arise from the effects of the challenged decisions on his use of the Great Burn and the Forests.

32. Plaintiff MONTANA WILDLIFE FEDERATION (MWF) is Montana's oldest, largest, and most effective conservation organization. For 90 years, MWF has worked to protect and enhance Montana's public wildlife, lands, waters, and fair-chase hunting and fishing heritage. Members of MWF hunt, fish, and recreate in and around the Great Burn in Montana and Idaho. Although most of their activities occur within the Montana portion of the Great Burn, the animals that they enjoy are wide-ranging species and depend on habitats that encompass vast areas across both Montana and Idaho. MWF Board members, staff, affiliated local clubs, and members have participated in the Nez Perce-Clearwater Land Management Plan revision process, including submitting comments, attending meetings, and lodging objections. Protecting wildlife habitat, habitat connectivity, quiet backcountry recreation, mountain goats, and wolverines is germane to MWF's organizational purposes. The interests of MWF will be irreparably compromised by the loss of plan-level protections and increased risk of future motorized use.

33. Skip Kowalski is an MWF member, current board member, and former MWF Board President. Mr. Kowalski is a retired Forest Service wildlife biologist who began working in Idaho near the Great Burn in 1968. He subsequently worked on National Forests in western Colorado, northeastern California, and the Sierra Nevada where he developed an appreciation for wildlife's dependence on vast relatively undisturbed landscapes. Mr. Kowalski later served as the Forest Service's Northern Region Wildlife Program Leader where he oversaw and provided guidance for wildlife habitat management on National Forest System lands across Montana and northern Idaho. His experience in diverse National Forest landscapes across the western United

States has given him a unique perspective of the important role that the Great Burn provides in connecting the Crown of the Continent, Selkirk-Cabinet-Yaak, and Greater Yellowstone ecosystems with the Selway-Bitterroot Wilderness Area and other wildlands of central Idaho. Mr. Kowalski has hiked and observed wildlife in the Great Burn numerous times, including in the Blacklead and upper Kelly Creek areas and along the Stateline Divide. During a July 1993 trip, he observed mountain goats, elk, and other wildlife in the Blacklead and upper Kelly Creek area.

34. In August 2026, Mr. Kowalski returned to the Hoodoo Pass area with the specific intention of resurrecting earlier memories, observing the uniqueness of a century-old wildfire and photographing wildlife along the Idaho-Montana border. Unfortunately, because of mobility issues and active wildfire activity nearby, he returned from his hike early after entering less than a mile into the backcountry. Although his wildlife viewing and photography was limited to only viewing deer tracks, Mr. Kowalski was able to take in the vastness of the Great Burn by road from vantage points near the Osier Lookout and from Independence Saddle. Mr. Kowalski intends to visit the Great Burn in the summer of 2027, preferably with his wife who was the District Ranger who administered the southern portion of the Great Burn during the 1990s.

35. Mr. Kowalski values the Great Burn as a place where he can experience a large, quiet, undeveloped landscape and observe native wildlife in relatively undisturbed habitat. Motorized noise, visible vehicle tracks, encounters with motorized users, and displacement or decline of mountain goats, wolverines, and other native wildlife would diminish his recreational and aesthetic enjoyment of the specific locations he visits. Mr. Kowalski's professional expertise informs his understanding of those effects, but his injuries arise from the impairment of his own use and enjoyment of the Great Burn.

36. Plaintiffs' identified members and functional members use specific areas affected by the Revised Plan for skiing, snowshoeing, hiking, fishing, hunting, camping, wildlife observation, photography, research, education, and other recreational and professional activities. They have concrete plans to return to those areas. Motorized noise and encounters, visible vehicle tracks, diminished solitude and wilderness character, and displacement or decline of wildlife would directly impair their use and enjoyment of these places.

37. The Revised Plan removed portions of the historic Great Burn Recommended Wilderness Area from recommended wilderness management and identified those lands as suitable for potential future OSV use. Although the Revised Plan itself does not authorize new OSV use, it removes plan-level protection, changes the governing suitability allocation, and creates the legal predicate for a later travel management decision authorizing such use. Particularly given existing OSV incursions, these changes materially increase the risk of motorized disturbance, diminished wilderness character, reduced wildlife security, and impaired landscape connectivity in areas Plaintiffs' members and functional members use and intend to revisit.

38. Plaintiffs' members and functional members also use the affected areas to seek, observe, study, and photograph native wildlife, including mountain goats and wolverines, and evidence of their presence. They carefully conduct these activities to avoid disturbing wildlife. Their experiences are enhanced by opportunities to encounter these species or their sign in intact, relatively undisturbed habitat and would be diminished by wildlife displacement, population decline, or habitat degradation. The Forest Service's failure to designate mountain goats as a Species of Conservation Concern and to adopt adequate plan components addressing stressors to mountain goats and wolverines materially increases the risk of those harms.

39. These threatened injuries are concrete and particularized. NFMA and NEPA requirements invoked in this action protect Plaintiffs' members' and functional members' underlying interests by requiring the Forest Service to consider ecological integrity, habitat connectivity, wildlife persistence, best available scientific information, reasonable alternatives, and environmental effects before adopting governing management direction. The Forest Service's alleged failure to satisfy those requirements exposed the particular places and wildlife they use and enjoy to an increased risk of harm.

40. Protecting the Great Burn's wilderness character, ecological integrity, habitat connectivity, and native wildlife, and preserving opportunities for quiet, nonmotorized recreation, are germane to each Plaintiff's organizational purposes. Plaintiffs seek declaratory and injunctive relief that does not require the participation of their individual members or functional members.

41. Plaintiffs submitted timely comments and administrative objections concerning the Draft Forest Plan and Environmental Impact Statement and the Draft Record of Decision, Revised Land Management Plan, and Final Environmental Impact Statement. Plaintiffs have exhausted all available and required administrative remedies. The requested relief would redress the injuries alleged above by setting aside the challenged portions of the Revised Plan and requiring the Forest Service to reconsider those decisions through lawful procedures and using the best available scientific information.

42. Defendant UNITED STATES FOREST SERVICE (Forest Service) is a federal agency within the United States Department of Agriculture. The Forest Service is responsible for implementing NEPA and NFMA and their implementing regulations, and adopted the Revised Plan, the agency action challenged in this litigation.

## LEGAL BACKGROUND

**The National Forest Management Act & Forest Planning**

43. The National Forest Management Act (NFMA) requires the Forest Service to develop comprehensive land and resource management plans (LRMPs or Forest plans) for each unit of the National Forest System. 16 U.S.C. § 1604(a). NFMA requires revision of Forest plans from time to time, but at least every fifteen years. *Id.* § 1604(f)(5). Despite this statutory requirement, Forest plans for the Nez Perce and Clearwater National Forests have not been revised since they were first adopted in 1987.

44. Forest plans are the primary source of direction for a national forest, and function as a zoning plan for each unit of the National Forest System. Forest plans include management areas that are suitable for certain uses (such as winter motorized use), as well as "plan components" (Desired Conditions, Standards, Guidelines, Objectives, and Goals) that constrain and guide future management actions in those areas. Monitoring of plan implementation is also required.

45. Subsequent "plans, permits, contracts, and other instruments for the use and occupancy" of the national forests must be consistent with the local forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(b).

46. In 2012, the Forest Service revised its regulations implementing Section 1604 of NFMA pertaining to the Forest planning process. *See* 36 C.F.R. Part 219 (2012 Planning Rule).

47. The Forest Service issued Directives in the Forest Service Handbook and Manual that supplement the 2012 Planning Rule and provide additional guidance and direction for the forest planning process.

48. The 2012 Planning Rule requires the Forest Service to use the best available scientific information in forest planning. 36 C.F.R. § 219.3.

49. Although "best available scientific information" is not defined in the 2012 Planning Rule, the Directives describe high quality and valid scientific information – i.e., the best available scientific information – to include the following characteristics: 1) the science uses well-developed scientific methods that are clearly described; 2) logical conclusions and reasonable inferences were drawn from the data; 3) the information has been appropriately peer reviewed; 4) a quantitative analysis was performed using appropriate statistical or quantitative methods; 5) the information is placed in proper context including spatial and temporal scales; and 6) references are appropriately cited.

50. The Directives go on to explain that determination of the best available scientific information should be based on what scientific information is the most accurate, reliable, and relevant with regard to the issues being considered in the planning process. Scientific data that may be considered the best available scientific information, depending on the circumstances, includes but is not limited to: 1) peer reviewed articles; 2) scientific assessments; 3) other scientific information, including but not limited to expert opinion, panel consensus, inventories, or observational data; 4) data prepared and managed by the Forest Service or other Federal agencies; 5) data or information from public and governmental participation; and 6) Indigenous knowledge.

51. The 2012 Planning Rule requires inclusion of plan components, including Standards or Guidelines, that address social and economic sustainability, ecosystem services, and multiple uses integrated with the plan components for ecological sustainability and species diversity.

52. Sustainability means the capability to meet the needs of the present generation without compromising the ability of future generations to meet their needs.

53. Ecological sustainability refers to the capability of ecosystems to maintain ecological integrity.

54. Economic sustainability refers to the capability of society to produce and consume or otherwise benefit from goods and services including contributions to jobs and market and nonmarket benefits.

55. Social sustainability refers to the capability of society to support the network of relationships, traditions, culture, and activities that connect people to the land and to one another, and support vibrant communities.

56. A revised forest plan must "include plan components, including standards or guidelines, to maintain or restore the diversity of ecosystems and habitat types throughout the plan area" including "key characteristics associated with terrestrial and aquatic ecosystem types." 36 C.F.R. § 219.9(a)(2).

57. A revised forest plan must contain plan components, "including standards or guidelines, to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area, including plan components to maintain or restore their structure, function, composition, and connectivity." 36 C.F.R. § 219.9(a)(1).

58. Ecological integrity is defined as "The quality or condition of an ecosystem when its dominant ecological characteristics (for example, composition, structure, function, connectivity, and species composition and diversity) occur within the natural range of variation and can withstand and recover from most perturbations imposed by natural environmental dynamics or human influence." 36 C.F.R. § 219.19.

59. Forest plans must also "include plan components, including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple uses in the plan area" including "habitat and habitat connectivity." 36 C.F.R. § 219.10(a)(1).

60. "Connectivity" is defined as the "Ecological conditions that exist at several spatial and temporal scales that provide landscape linkages that permit the exchange of flow, sediments, and nutrients; the daily and seasonal movements of animals within home ranges; the dispersal and genetic interchange between populations; and the long-distance range shifts of species, such as in response to climate change." 36 C.F.R. § 219.19.

61. Plan components that "maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area" must "tak[e] into account" six factors including the "Interdependence of terrestrial and aquatic ecosystems in the plan area...Contributions of the plan area to ecological conditions within the broader landscape influenced by the plan area...Conditions in the broader landscape that may influence the sustainability of resources and ecosystems within the plan area...[and] System drivers, including dominant ecological processes, disturbance regimes, and *stressors*...." 36 C.F.R. § 219.8(a) (emphasis added).

62. "Stressors" is defined as "Factors that may directly or indirectly degrade or impair ecosystem composition, structure or ecological process in a manner that may impair its ecological integrity, such as an invasive species, loss of connectivity, or the disruption of a natural disturbance regime." 36 C.F.R. § 219.19.

63. The Forest Service must "determine whether or not the plan components required" under § 219.9(a) "provide the ecological conditions necessary to: contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain

a viable population of each species of conservation concern within the plan area." 36 C.F.R. § 219.9(b)(1). This is known as a "coarse filter."

64. If the Forest Service determines that the plan components required in § 219.9(a) are "insufficient to provide such ecological conditions, then additional, species-specific plan components, including standards or guidelines, must be included in the plan to provide such ecological conditions in the plan area." 36 C.F.R. § 219.9(b)(1). This is known as a "fine filter" and complements the coarse filter approach to wildlife conservation.

65. Working together, coarse filter and fine filter plan components must maintain or restore "key characteristics associated with terrestrial and aquatic ecosystem types" and "rare aquatic and terrestrial plant and animal communities," 36 C.F.R. § 219.9(a)(2), thus providing for the diversity of plant and animal communities.

66. The 2012 Planning Rule defines Species of Conservation Concern (SCC) as "a species, other than federally recognized threatened, endangered, proposed, or candidate species, that is known to occur in the plan area and for which the regional forester has determined that the best available scientific information indicates substantial concern about the species' capability to persist over the long-term in the plan area." 36 C.F.R. § 219.9(c).

67. The Regional Forester is required to designate SCC. 36 C.F.R. § 219.7(c)(3).

68. The SCC designation process precedes and supports the forest plan revision process.

69. The 2012 Planning Rule requires revised forest plans to include "plan components, including standards or guidelines, to provide for... Protection of congressionally designated wilderness areas as well as management of areas recommended for wilderness designation to protect and maintain the ecological and social characteristics that provide the basis for their suitability for wilderness designation." 36 C.F.R. § 219.10(b)(1)(iv).

70. In developing a proposed plan or plan revision, the responsible official must identify and evaluate lands that may be suitable for inclusion in the National Wilderness Preservation System and determine whether to recommend any such lands for wilderness designation. 36 C.F.R. § 219.7(c)(2)(v). The Forest Service must use the best available scientific information to inform that process. Id. § 219.3.

71. Areas that are recommended for inclusion in the NWPS through the forest plan revision process must be managed to protect and maintain the social and ecological characteristics that provide the basis for the Wilderness recommendation. 36 C.F.R. § 219.10(b)(1)(iv).

72. Chapter 70 of the Forest Service Handbook provides additional direction regarding the Wilderness recommendation process.

**The National Environmental Policy Act**

73. Congress enacted the National Environmental Policy Act (NEPA) in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

74. NEPA's disclosure goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to ensure that the public has sufficient information to challenge the agency's action.

75. In 1978, the Council on Environmental Quality (CEQ) promulgated uniform regulations to implement NEPA that were binding on all federal agencies, including the Forest Service. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq*. (1978).

76. In 2025, CEQ repealed its NEPA regulations.

77. In 2025, the Department of Agriculture adopted NEPA regulations binding on its agencies, including the Forest Service. *See* 90 Fed. Reg. 29,632 (July 3, 2025).

78. The Forest Service began the NEPA process for the Revised Plan before September 14, 2020, and elected to conduct that process under the 1978 CEQ regulations. The Forest Service's compliance with NEPA is therefore evaluated under those regulations.

79. Agencies must also comply with NEPA's statutory provisions.

80. NEPA requires the Forest Service to prepare an environmental impact statement (EIS) for "major federal actions." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4 (1978).

81. The Forest Service's NFMA regulations also require the agency to prepare an EIS for the revision of forest plans. 36 C.F.R. § 219.5(a)(2)(i).

82. An EIS must consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. §§ 1508.7–1508.8 (1978).

83. Direct effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. § 1508.8(a) (1978).

84. Indirect effects are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable. 40 C.F.R. § 1508.8(b) (1978).

85. Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." 40 C.F.R. § 1508.8(b) (1978).

86. Cumulative impact results when the "incremental impact of the action [is] added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency. 40 C.F.R. § 1508.7 (1978).

**<u>The Administrative Procedure Act</u>**

87. The Administrative Procedure Act (APA) confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702. Upon review, the court shall "hold

unlawful and set aside agency actions…found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

88. The APA requires an agency to show a rational connection between the facts found and the decision made to implement a major federal action. If the agency fails to consider important aspects of the problem in reaching a decision, its decision is arbitrary and capricious.

89. Under the APA, "an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so. An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009).

## FACTUAL BACKGROUND

### The Nez Perce-Clearwater National Forests

90. The Nez Perce and Clearwater National Forests (collectively, the Forests) were administratively combined into the Nez Perce-Clearwater National Forests in 2013.

91. The Nez Perce-Clearwater National Forests are in the heart of north-central Idaho in a seven-county region, comprising Idaho, Clearwater, Latah, Shoshone, Benewah, Lewis, and Nez Perce counties.

92. The Forests share boundaries with the Idaho Panhandle National Forests to the north, the Lolo National Forest to the northeast, the Bitterroot National Forest to the southeast, and the Payette National Forest to the south:




93. The Forests encompass six ranger districts: Palouse, North Fork, Lochsa and Powell, Moose Creek, Salmon River, and Red River. The Forest Service is responsible for managing approximately four million acres across this landscape.

94. The Clearwater River drains most of these acres, and rugged mountain ranges, pristine rivers and streams, and extensive forested landscapes combine to create diverse ecosystems that provide spectacular recreational opportunities; substantial fish and wildlife habitat; and numerous forest, mineral, and range resources.

95. The landscape is characterized by deep, rugged river canyons surrounded by either rolling hills or steep jagged mountains. Mixed conifer forest interspersed with small but distinctive open meadows, grasslands, and pockets of deciduous trees and shrubs comprise most of the vegetative cover. Rivers, lakes, and streams are often framed by lush riparian vegetation. Western redcedar, Western larch, western hemlock, Douglas-fir, grand fir, lodgepole pine, and Ponderosa pine are the dominant conifer species, which drape the canyon walls and stretch to the uplands. Historically, Western white pine and whitebark pine were more prominent throughout the area.

96. The rich cultural heritage of the area is ongoing and still visible. American Indian use of the area dates back for millennia, and the Forests have been the home of the Nez Perce Tribe since time immemorial. Early settlers used routes through the Bitterroot Mountains to explore the far reaches of the country. These events have been remembered through the designation of the Lolo Trail Historic Landmark corridor and other historic routes that bisect the Forests.

97. The unique qualities of the Forests and their ability to provide ecosystem services characterize the roles and contributions of the area. These roles and contributions provide the basis for management direction and the foundation for realistic and achievable desired conditions for the Forests.

98. In addition to the role of providing common National Forest ecosystem services, such as clean air, clean water, nutrient cycling, and carbon sequestration, the Forests play a distinctive role in the local area, the region, and the nation by uniquely contributing diverse outdoor recreation opportunities; social and economic sustainability; cultural and heritage values, and ecological diversity.

**The Great Burn**

99. Much of the Nez Perce-Clearwater National Forests are part of the Great Burn ecosystem. The Great Burn ecosystem includes virtually all of the wildlife recorded by Meriwether Lewis and William Clark over two hundred years ago.

100. The region is named for the legendary fires of 1910 that left behind the region's distinctive characteristics. The fires created barren patches of land that have regrown, and in some cases reburned, resulting in a mosaic of forest conditions existing at various stages of development.

101. In the 1970s, the Forest Service conducted two Roadless Area Review and Evaluation (RARE I and RARE II) processes that partially inventoried National Forest System lands for wilderness quality lands and potential Wilderness designation by Congress pursuant to the Wilderness Act of 1964.

102. The approximately 257,000-acre Hoodoo Inventoried Roadless Area, located within the Great Burn ecosystem, was inventoried by the Forest Service during the RARE process.

103. Approximately 151,874 acres of the Hoodoo Inventoried Roadless Area are within the Nez Perce-Clearwater National Forests: the remaining inventoried roadless acreage is located on the adjacent Lolo National Forest. The collective area of the Hoodoo Inventoried Roadless Area is also known colloquially as "the Great Burn."

104. The Forest Service gave the Hoodoo Inventoried Roadless Area one of the highest possible wilderness quality ratings during the RARE II inventory.

105. Subsequent to RARE I and RARE II, the National Forest Management Act and its regulations require the Forest Service to identify and evaluate lands that may be suitable for inclusion in the National Wilderness Preservation System when revising forest plans. This

further inventory and evaluation process culminates in a determination regarding whether to recommend land for Wilderness designation by Congress.

106. Once recommended in the forest plan revision process, the Forest Service is required to manage Recommended Wilderness Areas (RWAs) to maintain their eligibility for Wilderness designation by Congress, including maintaining the "untrammeled" and "natural" nature of the RWA (i.e., ensuring that the ecological systems of an RWA are largely free from significant human control or manipulation and are managed to remain so, allowing natural forces to prevail), and ensuring that the RWA allows for wildlife connectivity and provides outstanding opportunities for solitude and primitive outdoor activities.

107. Recognizing the area's exceptional wilderness characteristics and other resource values, the Forest Service designated most of the Clearwater portion of the Hoodoo Inventoried Roadless Area as an RWA when it adopted the Clearwater Forest Plan in 1987. The Record of Decision for that plan identified the Great Burn Roadless Area as encompassing 149,147 acres on the Clearwater National Forest, of which approximately 113,000 acres were recommended for Wilderness designation by Congress.

108. The Hoodoo is the largest RWA and largest inventoried roadless area in Idaho and Montana. As such, it is a very important component of the Nation's wild public lands, contributing diverse outdoor recreation opportunities; social and economic sustainability; cultural and heritage values, and ecological diversity to the region and nation. The Nez Perce-Clearwater serves a unique national role providing vast, contiguous wildland areas, including the Selway-Bitterroot, Gospel-Hump, and Frank Church-River of No Return Wilderness Areas, with regional linkages to the Hells Canyon Wilderness and other inventoried roadless areas in Idaho

and Montana. Together, these areas comprise the largest complex of unroaded lands in the Lower 48 states.

109. As required of all RWAs, the Forest Service has managed the Hoodoo RWA to maintain its wilderness qualities, although unlawful motorized winter recreation has compromised these qualities in recent years.

110. In particular, illegal over-the-snow motorized vehicle use – also known as "trespass" – has occurred, and continues to occur, in the Hoodoo RWA. The Forest Service is aware of this trespass but has been unwilling or unable to enforce restrictions on OSV use in the area.

**Winter Travel Management**

111. In 2005, the Forest Service promulgated the Travel Management Rule.

112. The Forest Service issued regulations specifically for winter travel planning in 2015. *See* 36 C.F.R. Part 212 Subpart C (Subpart C).

113. Subpart C of the Travel Management Rule requires the designation of roads, trails, and areas on National Forest System lands open to OSV use. Use of off-road vehicles and snowmobiles on undesignated roads, trails, or areas is prohibited. This is referred to as the "closed unless designated open" approach.

114. Subpart C winter travel planning must be performed for all National Forest lands where snowfall is adequate for that use to occur.

115. The winter travel planning process must provide for public involvement, coordination with other entities, and application of the minimization criteria.

116. Roads, trails, and areas designated for OSV use must be reflected on an OSV use map made publicly available.

117. The Forest Service can avoid preparing winter travel plans if it has made previous decisions under other authorities (and included public involvement) that restrict motor vehicle or OSV use to designated routes and areas over an entire administrative unit or Ranger District, or parts of an administrative unit or Ranger District where snowfall is adequate for OSV use to occur, and no change is proposed to those previous decisions. 36 C.F.R. § 212.81(b). In those instances, the Forest Service issues public notice of the designations without any further public involvement. *Id.*

118. The Clearwater National Forest made travel management decisions in 2012 and 2017 that closed the relevant portion of the Hoodoo area to motorized use. Those decisions would have to be amended through a subsequent travel management process before the Forest Service could authorize new OSV use on the Clearwater side of the Forests.

119. With the exception of the Fish Lake All-Terrain Vehicle (ATV) Trail, the Forests' Travel Management Plan for the Clearwater National Forest closed the Hoodoo RWA to motorized access, including OSV use and mechanized (mountain bike) use.

120. The Forest Service has not completed a summer or winter travel management plan for the Nez Perce National Forest as required by the Travel Management Rule, nor has the agency expressed any intent to do so.

121. It is Forest Service policy that travel management planning, including Subpart C, cannot and will not be addressed during the forest plan revision process.

**<u>Effects of OSV Use</u>**

122. Snowmobiles and OSVs have substantial harmful impacts on a variety of resources, including air quality, water quality, vegetation, and wildlife. OSV use also adversely affects the experiences of other users of National Forestlands, such as those seeking quiet recreation, and

degrades Wilderness characteristics, including opportunities to experience solitude and participate in primitive forms of recreation.

123. OSVs are designed to, and do in fact, travel off-trail, disturbing soil, dispersing nonnative vegetation, and fouling water quality, among other deleterious effects.

124. Motors from OSV use create noise that degrades the naturalness of an area, thereby diminishing opportunities for solitude and primitive recreation.

125. OSV use reduces the likelihood that Congress will eventually designate such areas as Wilderness.

126. OSV use causes both a physiological and behavioral response in wildlife including mountain goats and wolverine.

127. OSV use can have significant adverse impacts on wildlife and big game species like mountain goats by displacing them from otherwise suitable habitats, including in the winter.

128. Wildlife including mountain goats and wolverine are vulnerable in the winter.

129. OSV use reduces the amount of available habitat because wildlife including mountain goats and wolverine avoid areas used by motorized vehicles.

130. Technological advances in recreational machinery have increased the power and ability of snowmobiles and other OSVs. New technological capabilities of OSVs allow riders to navigate steeper terrain, deeper snow, and more dense forest at a higher rate of speed. OSVs are able to travel much farther into the backcountry as a result of increased power and capability of OSVs. New technology allows OSVs to partake in activities such as "highmarking:" OSVs race up steep slopes toward ridge tops and then quickly turn before capsizing and race back down the slope.

131. Motorized snow bikes are becoming popular on the Forests. Motorized snow bikes have narrower tracks than traditional snowmobiles. Motorized snow bikes allow riders to go through tighter spaces and more narrow terrain than traditional snowmobiles.

132. Increases in machine power and geographic scope of OSV activity have changed, and exacerbated, the impacts of OSVs on the environment, wildlife, and other recreationists.

**The Revised Nez Perce-Clearwater Forest Plan: Administrative Review**

133. Plaintiffs provided timely written and verbal comments throughout the forest plan revision process raising concerns that the Forest Service failed to comply with the 2012 Planning Rule and NEPA.

134. The Forest Service issued the final environmental impact statement (FEIS) and draft record of decision (ROD) in November 2023.

135. Plaintiffs timely filed administrative objections to the Revised Plan outlining concerns that the Forest Service failed to comply with the 2012 Planning Rule and NEPA, including by failing to designate mountain goats as SCC, failing to protect wolverine, and improperly eliminating parts of the Great Burn/Hoodoo RWA.

136. The Forest Service dismissed plaintiffs' timely administrative objections to the Revised Plan and SCC designation.

137. The Forest Service published a notice of approval of the Revised Plan on January 10, 2025, and the Revised Plan became effective 30 days later, on February 9, 2025.

138. The Final Record of Decision and Revised Plan constitute final agency action.

139. Plaintiffs exhausted their administrative remedies.

**The Revised Plan's Hoodoo RWA Allocations**

140. Although the Revised Plan retains a recommended Wilderness designation for some of the Hoodoo area, the Forest Service reduced the total acreage and substantially altered the boundaries of the Recommended Wilderness Area in ways that drastically change its ecological value:



141. While the net acreage reduction is relatively small – approximately 3,700 acres – the significance of the agency's decision lies not in the total acreage change but in the location and character of the lands removed from and added to the RWA: the Revised Plan removes some acres that are of the highest value to wildlife from the RWA and replaces them with acreage that is of much lower value to wildlife.

142. The removed areas had been included within the Hoodoo RWA for nearly four decades.

143. On the north end of the RWA, roadless lands from Fish Lake Basin to Hoodoo Pass were removed at the request of over-snow vehicle users.

144. Roadless lands on the southern end around Goat Lake, Williams Peak, and Blacklead were likewise removed at the request of over-snow vehicle users.

145. The Forest Service also removed the Stateline Trail corridor to provide mountain bike access, separating the portion of the Hoodoo Roadless Area recommended for wilderness on the Nez Perce-Clearwater National Forests from the portion of the roadless area recommended for wilderness on the Lolo National Forest.

146. These excluded lands are some of the most important areas for mountain goats and wolverines in the Great Burn. They contain high elevation areas with documented mountain goat use and areas where snowpack persists into the early summer months, which are ideal locations for maternal wolverine denning.

147. At the same time, the Revised Plan adds acreage to the RWA elsewhere, but these areas provide more marginal quality wildlife habitat.

148. The Forest Service justified these boundary changes largely to fit existing (but currently unlawful) recreation use patterns and a desire to accommodate continued or future motorized and mechanized recreation opportunities. The agency explained that portions of the historic RWA

were removed to preserve winter motorized recreation opportunities, allow future mountain biking, maintain access along the Fish Lake corridor, and create boundaries that it believed would be easier to administer.

149. The agency repeatedly cited existing – and unauthorized – over-snow vehicle use and mountain bike use within portions of the historic recommendation as support for removing parts of the historic RWA.

150. The recreational uses upon which the Forest Service relied are not uses that are authorized within the Hoodoo Recommended Wilderness Area. The Clearwater National Forest adopted its Travel Management Plan in 2012, which closed the Hoodoo Recommended Wilderness Area to motorized uses, including over-snow vehicle use. The FEIS acknowledges that over-snow vehicle use occurring within portions of the Hoodoo RWA has occurred despite those restrictions and describes the area as experiencing unauthorized winter motorized use.

151. Likewise, mechanized transportation is contrary to Forest Service policy within Recommended Wilderness Areas because such uses do not protect and maintain the social and ecological characteristics that provided the basis for that recommendation and are inconsistent with preserving Congress's future Wilderness designation options. Rather than addressing the underlying problem of unauthorized motorized use in these ecologically critical areas, the Forest Service modified the boundaries of a nearly forty-year-old Recommended Wilderness area to accommodate motorized use at the expense of wilderness qualities and wildlife.

152. The Forest Service justified these changes by noting that much of the Hoodoo RWA remains protected as an Inventoried Roadless Area under the Idaho Roadless Rule, 36 C.F.R. Part 294, Subpart C. According to the agency, the Idaho Roadless Rule limits future road construction and therefore reduces the likelihood of future development within the area.

153. However, the Idaho Roadless Rule does not provide the same protections as a Recommended Wilderness designation. While the Idaho Roadless Rule generally restricts road construction and timber cutting within designated inventoried roadless areas, it does not prohibit over-snow vehicle use, does not prohibit other forms of motorized recreation where otherwise authorized, and does not require management to preserve wilderness character or Congress's future Wilderness designation options.

154. As the Forest Service acknowledges elsewhere in the FEIS, unauthorized over-snow vehicle use has occurred and continues to occur within portions of the Hoodoo area notwithstanding the Rule's protections. Consequently, the continued applicability of the Idaho Roadless Rule does not provide a reasoned basis for removing lands from a long-standing Recommended Wilderness Area, nor does it address the wildlife, recreation, and connectivity values that the recommendation was intended to protect.

155. The Forest Service failed to explain why existing unauthorized motorized use and anticipated enforcement difficulty outweighed the unchanged wilderness characteristics, wildlife values, connectivity, and stressors the Rule required it to address. The agency's rationale effectively rewards unauthorized use by conforming Recommended Wilderness boundaries to areas where motorized trespass has occurred.

156. This rationale is particularly difficult to reconcile with the Forest Service's findings regarding wildlife. The FEIS recognizes that the Great Burn supports one of only three mountain goat populations known to occur within roadless areas on the Forests and that the Hoodoo herd is "perhaps the second largest herd in the plan area."

157. The agency also acknowledges that the Great Burn landscape provides important habitat connectivity and maternal denning habitat for wolverines and identifies the Great Burn as one of the areas that provides the best connectivity for the species across the planning area.

158. The agency further recognizes that winter motorized recreation can adversely affect mountain goats and wolverines. Yet the Revised Plan removes portions of the historic recommendation to accommodate the very stressor (recreational use) that the agency acknowledges adversely affects the wildlife values that originally justified Wilderness recommendation.

159. The Revised Plan also fails to include plan components specifically designed to maintain or restore the landscape connectivity values that the Forest Service repeatedly identifies as one of the defining characteristics of the Great Burn landscape. This omission is particularly significant because the Hoodoo RWA directly adjoins the Great Burn Recommended Wilderness Area on the Lolo National Forest. The FEIS acknowledges that the Lolo National Forest continues to manage approximately 89,530 acres of the Great Burn as Recommended Wilderness and that the area functions as a single connected ecological landscape across the Idaho-Montana border.

160. The Lolo National Forest is currently in the process of revising its Forest Plan. It is unclear whether the Lolo National Forest will retain the current Recommended Wilderness boundary on the Montana side of the Hoodoo Roadless Area or alter it. However, differing management regimes adopted on either side of the Idaho/Montana state line will create a patchwork of motorized and nonmotorized management within a landscape that the Forest Service itself recognizes as ecologically connected.

161. Rather than reducing management complexity, the Revised Plan's boundary changes and differing recreational designations may increase administrative and enforcement challenges

while diminishing the continuity of protections that have characterized the Great Burn/Hoodoo recommended wilderness complex for nearly forty years.

**Mountain Goats (*Oreamnos americanus*)**



162. Unlike many areas in the west where they have been introduced, mountain goat populations on the Forests are native. Lewis and Clark noted that their guides indicated that there were mountain goats in the Blacklead area while passing through the region.

163. Mountain goats select steep slopes and adjacent alpine areas, typically occupying subalpine and alpine habitats where trees are either absent or scattered. Habitats selected by mountain goats are often characterized by harsh climate with frequent strong winds, significant snow accumulation, and snowpack that persists for more than 8 months annually. Habitation to these harsh environments is a strategy for minimizing exposure to predators that are unable to adapt to the same conditions.

164. Males, females, and offspring are typically referred to as billies, nannies, and kids, respectively. Both billies and nannies have horns, and most horn growth occurs during an

individual's first 3 years. Adult males are generally 10–30% larger, appear stockier or heavier in the chest and shoulders, and have beards that are heavier and broader than those of adult females.

165. Breeding season occurs between early November and mid-December followed by a gestation period of approximately 180 days. Although nannies in some populations reach sexual maturity at age 2 and produce their first kid at age 3, on average most nannies do not have their first offspring until 4.7 years old. This delay in breeding dramatically reduces potential for rapid growth in most mountain goat populations.

166. Mountain goat kids are precocious and begin to forage and ruminate within days after birth. Nursery groups (females and their offspring, including yearlings) are formed when kids are approximately 2 weeks old. During this period, 2-year-old billies usually leave nursery herds and remain solitary or form small groups. Kids remain with their mothers through their first winter, and although presence of the mother is thought to increase survival of kids, orphaned kids can survive. After sexual maturity, reproductive success generally increases until peaking at 8 years old.

167. Nursery groups typically move greater distances daily (2–5 km) than males (<1 km/day). Seasonal movements may result in animals moving to lower elevations at or just above treeline or slopes with southern exposures during winter. In summer, males may venture into forested areas away from steep slopes to feed, while females and kids usually feed on or in immediate proximity to steep slopes used to escape potential predators.

168. Most mountain goat mortality occurs between autumn and spring, similar to other ungulate species. The extremely steep, rocky habitats mountain goats inhabit are treacherous, and mountain goats of any age can die from falls or in avalanches. Mountain goat survival declines with increasing winter snowfall and increasing summer temperatures. Severe winters

decrease kid survival and negatively impact reproduction. Deep snow limits mountain goat mobility and ability to acquire limited food resources. Expending additional energy during severe winters can increase mortality due to malnutrition, particularly when individuals enter winter in poor body condition. Above average summer temperatures can cause heat stress in mountain goats as they forage and accelerate desiccation of forage plants.

169. Mountain goats are intermediate browsers, primarily feeding on grasses and alpine shrubs during summer and autumn. They select plants based on high nutrition value and availability of minerals, such as sodium. In areas where grasses are covered by snow, mountain goats readily switch to a diet of browse, including mountain mahogany and conifers. Mosses and lichens may also be consumed where available. Scientists have reported a correlation between female nutrition and kid:nanny ratios, and availability of summer forage is related to pregnancy rate. Winter forage is critical to adult over-winter survival and fetal development.

170. The best available scientific information indicates substantial concern regarding mountain goat capability to persist over the long-term on the Forests.

171. First, mountain goats are susceptible to disturbance by recreational activities, both motorized and non-motorized, and may abandon preferred high-quality areas because of disturbance.

172. Several modes of backcountry winter recreation, including snowmobiling, have the potential to disturb goats. Repeated disturbance by helicopters, snowmobiles, logging, or road building can cause displacement from habitat, group dissolution, nanny-kid separations, and injury.

173. According to the State of Idaho Department of Fish and Game (IDFG), winter is a time of profound nutritional deprivation for mountain goats. Deep snow reduces food availability and

increases energy expenditure. Mountain goats often constrain their movements and occupy small home ranges during winter. Winter range is important to long-term survival of mountain goats and should be identified and managed to reduce disturbance to mountain goats.

174. Because physical characteristics are more important than vegetative characteristics, habitat generally cannot be treated, manipulated, or "restored" to produce quality winter habitat. This situation makes management and conservation of quality winter range crucial to maintaining current populations and distribution of mountain goats in Idaho, and limiting human disturbance is essentially the only management strategy available. Winter range habitats are found in relatively isolated areas of the Panhandle, central Idaho, Hells Canyon, and the Snake River Range.

175. Cat-skiing, snowmobiling, snow biking, and non-motorized backcountry skiing are increasingly popular among outdoor adventure enthusiasts. Rapidly expanding and innovative technology has resulted in lighter equipment and more powerful machines, allowing more people to access remote alpine environments with increasing frequency. In addition, as climate changes and traditional recreation areas receive less snow, more recreation activity and pressure will be placed on higher elevation, remote habitat typically favored by mountain goats.

176. Because over-snow vehicles are more accessible to recreationists than helicopters or other aircraft, expansion of motorized recreation areas, routes, roads, and trails has the highest potential to impact mountain goats.

177. These disruptions result in a variety of negative impacts, including habitat abandonment, changes in seasonal habitat use, alarm responses, lowered foraging and resting rates, increased rates of movement, and reduced productivity.

178. On the Idaho Panhandle National Forests adjacent to the Nez Perce-Clearwater National Forests, the Forest Service explained that "Goats frequent alpine and subalpine habitat in precipitous terrain, usually at timberline or above. In winter, they are often found on steep south-facing slopes, cliffy terrain, south-facing canyon walls, and windblown ridgetops. Human-caused disturbance, especially winter recreation, is identified as a risk factor for the species. Repeated disturbance may result in abandonment of favored habitats, potentially reducing the probability of winter survival by increasing both energetic demand associated with feeding and exposure to potential predators."

179. Because Montana and Idaho share populations of mountain goats that do not recognize political boundaries and thus routinely and regularly cross the state line while carrying out life functions, the State of Montana Fish, Wildlife, and Parks (MFWP) weighed in on the Revised Plan.

180. In its comments on the Revised Plan, MFWP stated that "Mountain goats are of particular concern along the MT/ID border, especially within the Great Burn recommended wilderness area in Montana, which is adjacent to the Hoodoo roadless area in Idaho. In years past (1980s, '90s, and early 2000s), mountain goats could be found in several drainages of the Great Burn (Cache, Straight, West Fork of Fish, North Fork of Fish, and Trout creeks). Today there is just one population remaining in the Trout Creek drainage; it is unknown why the other groups disappeared. The Trout Creek goats are a small native population that summers along the MT/ID border in the Heart Lake area and winters at lower elevations in the Trout Creek drainage. The long-term viability of this herd is in part dependent on keeping the habitat secure, as well as maintaining connectivity with other mountain goat populations, the nearest of which is the Blacklead herd in Idaho. Maintaining connectivity between these herds is important for genetic

diversity and potential rescue (Parks et al. 2015). FWP is concerned that winter motorized use in the Hoodoo could have direct negative impacts on the Blacklead herd and thereby disrupt connectivity with the Trout Creek herd…Idaho Fish and Game states that increasing snowmobile and snow bike access is a concern to mountain goats in this area (IDFG 2019)."

181. According to the Forest Service, based on limited survey effort, the most acute decline of mountain goat populations is within the Blacklead subpopulation within the Hoodoo Recommended Wilderness Area, where the Idaho Department of Fish and Game has documented sharp declines in mountain goat numbers. Flight counts by the Idaho Department of Fish and Game in areas occupied by goats in the Hoodoo Recommended Wilderness Area documented snowmobile tracks near historic mountain goat areas and counted less than twenty individual goats where past winter counts were in the low one-hundreds.

182. Second, climate change threatens mountain goat persistence. Warmer spring and summer temperatures negatively affect over-winter survival and juvenile growth, due to direct effects on energy balance and thermoregulatory stress, as well as indirect effects on plant nutrition, availability, and phenology. During hot summers, mountain goats are susceptible to heat stress and will seek shade or snow patches to stay cool, which can result in reduced time spent foraging.

183. Climate change modeling efforts in both coastal Alaska and Washington Cascades suggest mountain goat ranges will shrink (up to 86% under some scenarios), becoming more fragmented and isolated by the end of the century. A similar pattern could be expected for mountain goats in Idaho given mountain goats already occur at the highest elevations available across the majority of the state, particularly in the Panhandle, Clearwater, and Southwest regions. Idaho populations are small and fragmented, with low intrinsic productivity, highly variable

juvenile and yearling survival, and population declines in some population management units. These characteristics, combined with low to moderate levels of genetic diversity, suggest a low adaptive capacity.

184. Third, due to hunting pressure, many of the historic mountain goat hunting areas in the Clearwater region are currently closed to hunting because of low population levels or the loss of mountain goats entirely from previously occupied ranges.

185. Due to these stressors, the State of Idaho in the Idaho State Wildlife Action Plan designated mountain goats a Species of Greatest Conservation Need, priority Tier 3.

186. The threats mountain goats face on the Forests are underscored by the Idaho Department of Fish and Game's Idaho Mountain Goat Management Plan for 2019-2024 ("2019 Idaho Mountain Goat Plan").

187. The Forest Service utilized the 2019 Idaho Mountain Goat Plan in developing the Revised Plan.

188. The 2019 Idaho Mountain Goat Plan is the best available scientific information regarding mountain goat habitat needs and stressors.

189. In the FEIS for the Revised Plan, the Forest Service cited the Idaho Mountain Goat Plan to describe the threats and stressors facing mountain goat: "[the 2019 Idaho Mountain Goat Plan] identifies climate change as a threat to mountain goats"; "[b]ecause mountain goats in Idaho occur on the periphery of their range and in isolated areas with small population sizes, they have lower levels of genetic diversity compared to their counterparts in the core of their range"; "[t]hreats identified in the Draft Idaho Mountain Goat Plan include road building, timber harvest, mining, power or infrastructure, oil and gas extraction, wildfire and fire suppression, or changing climate, which may reduce the limited habitat that currently exists"; "[a pattern of range

fragmentation and isolation due to climate change] could be expected for mountain goats in Idaho given that they already occur at the highest elevations available across most of the state, particularly in the Panhandle, Clearwater, and Southwester regions"; and "[t]he Draft Idaho Mountain Goat Plan predicted a 0.9 to 1.6-meter decline in winter snow accumulation and about a 4.2 to 4.3 degree increase in temperatures in mountain goat habitat in the Black Snow, Lochsa-Selway, and Lower Salmon population management units, which are the Idaho Department of Fish and Game mountain goat units in the plan area."

190. The 2019 Idaho Mountain Goat Plan states that: "[h]istorically, there were many more mountain goats in Idaho than there are today. Open seasons with unlimited tags through the 1950s reduced mountain goat populations in many areas. Increasingly conservative hunting season structure with controlled hunts has helped stabilize some populations, but others continue to decline." The FEIS for the Revised Plan incorporates these findings verbatim but adds additional scientific sources for these statements that do not appear in the 2019 Idaho Mountain Goat Plan.

191. In comments on the Draft Revised Forest Plan, IDFG expressed grave concerns about the lack of plan components to conserve mountain goats. The Department explained that "two plan components aimed at protecting big game species were not included in the proposed action despite being advanced by the IDT, after Collaborative review, and without consulting with the IDFG IDT member who helped develop those components. The two dropped components are: (1) "Motorized over-snow travel is unsuitable in mountain goat winter range," and (2) "Motorized access is not suitable in mapped elk calving areas from May 1 to September 15." Both of these components were developed and advanced to the collaborative by the IDT in response to legitimate concerns about the populations of elk and mountain goats on the Forests,

concerns that were supported by information in the Assessment on population status and trends and in peer reviewed scientific literature about effects of motorized disturbance. Both components were eliminated in the proposed action without explanation or discussion with IDFG. Other components, in whole or in part, suffered a similar disposition which raises specific concerns about the ability of the proposed forest plan to adequately meet wildlife goals. More importantly, not including these components for public review and input marginalizes the opportunity of wildlife and motorized recreation public stakeholders to advise the NPCNF and seek solutions for potential conflicts."

192. IDFG went on to note: "Mountain goats are present in low numbers across the planning area. Mountain goats have limited range and strict habitat requirements, especially in winter when range is severely constricted by snow. Although mountain goat populations on the Forests were thought to be stable (see Assessment), surveys conducted by IDFG since the Assessment was written found drastic, unexplained declines in some Forest mountain goat herds in the Selway and [North Fork] Clearwater portions of the Forest, exacerbating concerns about the need for protection...Mountain goats are sensitive to disturbance. Disturbance can affect resting, feeding, reproductive success, cover selection, and other behaviors necessary for individual survival and sustaining populations. Snow machine use within the vicinity of mountain goats has the potential to disturb mountain goats at a time when they are confined to severely limited habitat and are under maximum survival stress. IDFG biologists and others have observed increasing snow machine incursions into mountain goat winter range in the past years and are concerned that increasing disturbance by over-snow motorized activities will further stress mountain goats and threaten local population[s]."

193. In including mountain goats on the preliminary SCC list for the Lolo National Forest, the Forest Service explained that "Compared to other ungulates, the species appears particularly sensitive to human disturbance (Mountain Goat Management Team 2010). Motorized and non-motorized recreation, as well as aerial vehicles, are well documented to affect the species, particularly during winter and kid rearing season, with impacts ranging from permanent or seasonal displacement, to changes in behavior and productivity (Idaho Department of Fish and Game 2019, Mountain Goat Management Team 2010, Northern Wild Sheep and Goat Council 2020). The species is expected to be largely negatively affected by climate change (Northern Wild Sheep and Goat Council 2022). Increasing summer temperatures can increase physiological costs to individuals while reducing forage productivity, with subsequent implications for recruitment and survival (White et al. 2011, White et al. 2020, Young et al. 2022, Northern Wild Sheep and Goat Council 2022). Ultimately, the area suitable for sustaining the species is expected to decline (White et al. 2020, Elsen and Tingley 2015), which due to the small population sizes typified by the species, may have additional effects if connectivity among populations is not enhanced (Young et al. 2022). All herds within the plan area have demonstrated or are suspected to have population declines. Populations within the plan area are small and isolated and likely have limited connectivity to other populations due to suitable habitat arrangements within the larger landscape. Although the specific causes of the population declines are unknown, multiple threats to the species exist within the plan area, and when coupled with the inherently small populations within the plan area indicate there is substantial concern for the species."

194. The best available scientific information indicates that mountain goat populations are declining precipitously on the Forests and that continued viability of the species is at risk.

**The Revised Plan's Mountain Goat SCC Decision and Plan Components**

195. On December 6, 2019, the Regional Forester for Region 1 of the Forest Service—which includes both the Nez Perce-Clearwater National Forests and the adjacent Lolo National Forest—issued a preliminary list of Species of Conservation Concern (SCC) for the Revised Plan. Mountain goats were not included.

196. After public comment and administrative objection, in which Plaintiffs urged the agency to better protect mountain goats, the Forest Service issued the final SCC list for the Forests on January 10, 2025. Mountain goats were not included on the Forest's final SCC list.

197. By contrast, the Forest Service proposed mountain goats as an SCC on the neighboring Lolo National Forest and relied on the 2019 Idaho Mountain Goat Plan to support that preliminary determination.

198. The same stressors supporting the Lolo determination—human disturbance, climate change, population declines, small and isolated herds, and limited connectivity—also confront mountain goat populations on the adjacent Nez Perce-Clearwater National Forests, including populations that use the connected Great Burn landscape. Yet the Forest Service reached the opposite conclusion on the Nez Perce-Clearwater National Forests.

199. The Forest Service stated that it declined to designate mountain goats as an SCC on the Nez Perce-Clearwater because most herds are observed within either Idaho Roadless Rule areas or designated Wilderness, where road building, timber harvest, mining, power infrastructure, or oil and gas extraction are prohibited. That rationale does not address OSV use: the Idaho Roadless Rule does not prohibit OSV access, and winter motorized disturbance is a principal stressor identified in the scientific record.

200. The agency compounded that omission by removing Recommended Wilderness protections from portions of mountain goat winter range in the Great Burn and identifying those lands as suitable for potential future OSV use. The best available scientific information does not support those changes because potential OSV use would not maintain or restore the ecological conditions mountain goats require to persist over the long term.

201. The Revised Plan mentions mountain goats only once, in a general list of multiple-use wildlife. Because the Forest Service did not designate mountain goats as an SCC, the Revised Plan includes no species-specific plan components addressing mountain goat habitat needs, population viability, or principal stressors, including OSV use.

**Wolverine (*Gulo gulo*)**



Photo by Steve Kroschel

202. The North American wolverine (*Gulo gulo luscus*) is a medium-sized carnivore found within the west-northwestern contiguous United States, Alaska, and Canada, and is currently listed as a Threatened species under the Endangered Species Act.

203. Systematic monitoring across the wolverine's North American range has not been conducted given the difficulty in surveying this highly mobile species and its occupancy within large and relatively inaccessible areas.

204. Wolverines are capable of moving and dispersing over great distances over short periods of time. Wolverine populations are characterized by naturally low densities in North America. The species is highly territorial, with very little overlap between same-sex adults. Wolverines occupy a variety of habitats but generally select habitats in locations away from human presence and settlements. Wolverines consume a variety of food resources and seasonal switching of prey is commonly observed.

205. Wolverine reproduction includes the following characteristics: polygamous behavior (i.e., male mates with more than one female each year), delayed implantation (up to 6 months), a short gestation period (30–40 days), denning behavior, and an extended period of maternal care. The reproductive behavior in wolverines is temporally adapted to take advantage of the availability of food resources, limited interspecific competition, and snow cover in the winter.

206. The Great Burn provides the best connectivity habitat for wolverine on the Forest, allowing for critical travel and gene flow between numerous populations of wolverine comprising central Idaho, southern Idaho, the Bob Marshall Wilderness, the Yellowstone Ecosystem, Glacier National Park, and British Columbia.

207. Wolverine are threatened with extinction due to climate change that will reduce wolverine habitat by reducing the areas that maintain persistent snowpack providing for food caches, denning, and reproduction.

208. Wolverine are also threatened with extinction due to motorized recreation, particularly winter motorized recreation that disturbs and displaces denning females and their kits.

209. Wolverine, especially female wolverine, exhibit avoidance of habitat impacted by motorized off-road recreation, including OSV use.

210. The reduction of habitat containing persistent snowpack due to climate change will simultaneously restrict winter recreationists to the remaining areas that maintain persistent snowpack.

211. The Great Burn Roadless Area and Hoodoo RWA contain some of the highest quality wolverine habitat remaining in the contiguous United States. Its high-elevation terrain supports persistent spring snowpack, a habitat feature strongly associated with wolverine occupancy and maternal denning, while its large, undeveloped, and roadless landscape provides important connectivity to other suitable wolverine habitats to the north and south.

212. The Forest Service recognizes that motorized winter recreation adversely affects wolverine and wolverine habitat, including heightened effects on female wolverine.

213. Relying on Inman et al. (2013), the Forest Service explains that wolverines are generally associated with high-elevation landscapes characterized by steep terrain, persistent spring snow cover, limited road density, low levels of human activity, and proximity to talus fields and forest cover. The agency further recognizes that maternal denning habitat is particularly important because reproductive success is a critical factor affecting the species' long-term viability.

214. The Forest Service also acknowledges that protected areas are strongly associated with wolverine presence and that one of the primary differences between protected areas and surrounding landscapes is lower levels of human use.

215. The agency further recognizes that winter recreation may result in displacement, avoidance behavior, disturbance of denning females, and indirect habitat loss, particularly in areas supporting higher levels of recreation activity.

216. The FEIS additionally notes that the effects of winter recreation may become more pronounced as climate change reduces the availability of persistent snowpack and concentrates both recreationists and wolverines into the remaining areas of suitable habitat.

217. The U.S. Fish and Wildlife Service prepared and updated a Species Status Assessment for the North American Wolverine (Wolverine SSA).

218. In March of 2018, the United States Fish and Wildlife Service (FWS) issued its first iteration of the Wolverine SSA (2018 Wolverine SSA).

219. The 2018 Wolverine SSA states that "[m]anagement actions for conservation of the wolverine and its habitat are included within State Wildlife Action Plans, the Management Plan for the Conservation of Wolverines in Idaho (IDFG 2014), and USDA Forest Service Land and Resource Management Plans…Various provisions of these plans include, but are not limited to, winter road closures, fire management, and land acquisition or conservation easements. These management measures, currently and in the future, will alleviate effects associated with potential impacts related to stressors discussed in this report."

220. In September 2023, FWS issued an addendum to the 2018 Wolverine SSA (2023 Wolverine SSA). The 2023 Wolverine SSA is the most recent version of FWS's Wolverine Species Status Assessment and was issued before the Forest Service approved the Revised Plan.

221. The 2023 Wolverine SSA states that: "[i]n our 2018 SSA, we identified Forest Plans as important 'federal mechanisms' that, in combination with State Wildlife Action Plans, 'will alleviate effects associated with potential impacts related to stressors discussed in this report.' However, in our 2018 SSA, we reviewed only four Forest Plans and did not identify in those plans any specific standards (mandatory constraints on project and activity decision-making) for wolverines." The FWS therefore conducted a more comprehensive review of relevant forest plans for the 2023 Wolverine SSA.

222. FWS's review of forest plans in the 2023 Wolverine SSA revealed that "[the FWS] did not identify any wolverine-specific standards and overall, there was a lack of consistency across plans."

223. The 2023 Wolverine SSA explained that coarse-filter protections provide conservation benefits to wolverines but that quantifying those benefits outside wilderness areas is difficult because forest-plan standards and conservation measures vary across the species' range.

224. The FWS's review of forest plans in the 2023 Wolverine SSA led to the conclusion that "variability, and the lack of a range-wide assessment that overlays the areas of U.S. Forest Service over-snow vehicle use closures and wolverine habitat, make it difficult to characterize the effects of over-snow travel management planning on wolverines in the contiguous U.S."

**The Revised Plan's Wolverine Plan Components**

225. The Revised Plan does not include species-specific/fine filter plan components for wolverine despite the importance of the Forests to wolverine and despite the Forest Service's recognition that winter recreation represents one of the most significant threats to the species within the planning area.

226. Although the Forest Service's FEIS extensively reviews the scientific literature regarding wolverine ecology and habitat requirements, the agency did not apply that science in developing the Revised Plan. Instead, it offered three justifications for omitting species-specific plan components.

227. First, the Forest Service concluded that species-specific plan components were unnecessary because "most of the wolverine habitat already falls within either designated wilderness or Idaho Roadless Rule areas."

228. Designated Wilderness prohibits winter motorized recreation and therefore provides meaningful protection for wolverine habitat; but Recommended Wilderness Areas protect wolverines from winter motorized recreation only where motorized use is otherwise prohibited through travel-management decisions or non-motorized Winter Recreation Opportunity Spectrum (Winter ROS) allocations. The Forest Service removed significant acreage from the Hoodoo RWA due to current illegal OSV trespass and may officially open those lands to motorized use in the future.

229. The Forest Service reported that approximately 40 percent of modeled maternal wolverine habitat occurs within designated Wilderness and approximately 11 percent occurs within recommended wilderness where OSV use is prohibited. It separately identified 58 percent of modeled maternal habitat as closed to winter motorized use within non-motorized Winter ROS, leaving 42 percent in areas open to motorized access.

230. The weakness of the agency's rationale is particularly apparent on the Clearwater portion of the Forests, where much of the modeled maternal wolverine habitat occurs outside designated Wilderness. There, wolverine conservation depends heavily on Recommended Wilderness and

non-motorized Winter ROS allocations. Yet the Revised Plan allocates less maternal habitat to those protective allocations than several other alternatives considered by the agency.

231. The Revised Plan also removes plan-level protections from approximately 12,131 acres of maternal wolverine habitat and approximately 13,747 acres of primary wolverine habitat within the historic Hoodoo RWA and identifies those lands as suitable for potential future OSV use. These changes occur within one of the most important wolverine connectivity areas in the Northern Rockies: the Forest Service acknowledges that connectivity is highest along the Idaho-Montana border and that future winter motorized recreation in the affected Hoodoo lands could disturb and displace wolverines.

232. The agency likewise did not recommend Wilderness protection for several other roadless areas it identified as important to wolverine connectivity. The FEIS recognizes that Hoodoo, Meadow Creek-Upper North Fork, Rawhide, North Fork Spruce-White Sand, and Sneakfoot Meadows provide some of the planning area's most important connectivity habitat. Yet the Revised Plan recommends only Hoodoo for wilderness designation while reducing the size of that recommendation to accommodate recreational uses.

233. Idaho Roadless Rule lands provide even less protection for wolverine because that Rule generally regulates road construction and timber harvest but does not prohibit OSV use, which does not require road construction. Indeed, the FEIS acknowledges that "[w]inter motorized recreation would be a suitable use within Idaho Roadless Rule Areas unless they are also within recommended wilderness or are identified as non-motorized in the winter recreation opportunity spectrum settings."

234. Approximately 54 percent of maternal habitat occurs within Idaho Roadless Rule lands, which do not independently prohibit winter motorized recreation. The Forest Service therefore

cannot reasonably rely on the mere existence of Idaho Roadless Rule protections to conclude that winter-recreation threats have been adequately addressed.

235. The Revised Plan's recommended wilderness allocations, Winter ROS settings, Idaho Roadless Rule protections, and other coarse-filter components do not adequately protect maternal wolverine habitat from winter recreation. To the contrary, the FEIS identifies winter recreation as a principal stressor, acknowledges that substantial maternal habitat remains open to motorized winter recreation, recognizes that future travel planning decisions could expand such uses in important habitat, and admits that disturbance and displacement are likely where such uses occur.

236. Yet the Revised Plan contains no species-specific/fine filter Standards, Guidelines, or other plan components designed to minimize disturbance within maternal denning habitat, maintain habitat connectivity, limit winter motorized recreation in key habitat, or otherwise contribute to the species' recovery.

237. Second, the Forest Service asserted that Revised Plan Standard FW-STD-WL-01 provides for wolverine needs. That standard incorporates the Northern Rockies Lynx Management Direction, which prohibits expansion of over-snow routes or designated play areas beyond baseline areas of consistent snow compaction and prohibits new winter motorized uses in lynx habitat.

238. But the motorized use occurring in the Great Burn and Hoodoo Roadless Area consists of unmapped, user-created tracks outside designated routes or play areas. Those tracks do not create the "consistent snow compaction" typically found on routes or in designated play areas. Standard FW-STD-WL-01 therefore does not address the unconstrained OSV use that stresses wolverines.

239. Third, the Forest Service relied on the 2018 Wolverine SSA's statement that forest plans alleviate several identified stressors; but the 2023 Wolverine SSA, issued before approval of the Revised Plan, revisited and materially qualified that premise.

240. The agency's analysis does not reference the 2023 Wolverine SSA or its conclusions, even though it was before the Forest Service when it issued the Revised Plan.

## FIRST CLAIM FOR RELIEF

### The Forest Service's Revision of the Hoodoo Recommended Wilderness Area Violates NFMA

241. Plaintiffs incorporate by reference all preceding paragraphs.

242. The 2012 Planning Rule requires the Forest Service to develop plan components that maintain or restore ecological integrity and connectivity, taking into account stressors and conditions in the broader landscape. 36 C.F.R. §§ 219.8(a)(1), 219.9(a)(1).

243. In revising a forest plan, the responsible official must consider stressors, identify and evaluate lands that may be suitable for wilderness designation, identify the suitability of lands for particular uses, and manage recommended wilderness areas to protect and maintain the characteristics underlying their suitability. 36 C.F.R. §§ 219.7(c)(2)(iv), (v), (viii), 219.10(b)(1)(iv).

244. A significant stressor that compromises the ecological integrity and connectivity of the Hoodoo RWA is over-the-snow motorized use, including OSV trespass.

245. In removing portions of the Hoodoo Inventoried Roadless Area from the RWA and identifying them as suitable for potential future motorized and mechanized use, the Forest Service failed to give reasoned consideration to the factors required by the 2012 Planning Rule, including stressors, connectivity, and conditions within the broader landscape.

246. The Forest Service instead elevated existing unauthorized use and enforcement difficulty over the unchanged wilderness characteristics, wildlife values, connectivity, and stressors the Planning Rule required it to take into account.

247. The Forest Service's prior factual findings supporting Recommended Wilderness Area designation of the Hoodoo Inventoried Roadless Area and closure of the relevant lands to motorized use have not materially changed. Nor did the agency identify changed ecological circumstances that rationally explain the lack of strong plan level protection; instead, the record shows continuing or worsening concern about mountain goat populations, wolverine denning habitat, climate change, connectivity, and winter motorized disturbance.

248. The best available scientific information does not support removing plan-level protection from these portions of the Great Burn or identifying them as suitable for potential future motorized use, because such use would not maintain or restore habitat connectivity or provide ecological conditions necessary for mountain goats and wolverine to persist on the Forests.

249. The Revised Plan is arbitrary, capricious, and not in accordance with NFMA and must be set aside under the APA. 5 U.S.C. § 706(2)(A).

250. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF

### The Forest Service's Revision of the Hoodoo Recommended Wilderness Area Violates NEPA

251. Plaintiffs incorporate by reference all preceding paragraphs.

252. NEPA requires the Forest Service to consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. §§ 1508.7–1508.8 (1978).

253. The Revised Plan removed portions of the Hoodoo RWA from the long-standing RWA and identified those currently closed lands as suitable for potential future motorized use.

254. The FEIS failed to take a hard look at the direct, indirect, and cumulative consequences of the changed Hoodoo RWA allocations themselves. Those allocations immediately remove plan-level Recommended Wilderness protection from high-elevation mountain goat and wolverine habitat, fragment the RWA, diminish wildlife security and landscape connectivity, and identify lands previously managed to preserve wilderness characteristics as suitable for potential motorized use. The new suitability determination also changes the governing management direction and removes a plan-level constraint on any subsequent travel-management decision. The FEIS did not adequately analyze these effects or, in combination with the climate-driven contraction of persistent snow habitat, the increased risk of wildlife displacement and disturbance if the Forest Service later authorizes OSV use.

255. The FEIS instead emphasized the net acreage retained as Recommended Wilderness without adequately analyzing the geographic redistribution of protected acreage. In particular, the FEIS failed to examine the consequences of removing valuable high-elevation habitat and the Stateline Trail corridor from the RWA or creating a fragmented patchwork of motorized and nonmotorized allocations across a landscape the Forest Service—and wildlife—recognizes as ecologically connected to the adjacent Lolo National Forest.

256. The FEIS also failed adequately to analyze the consequences of the new, discontinuous management boundary itself, including whether the juxtaposition of lands identified as suitable for motorized use with lands managed for nonmotorized use would increase existing unauthorized winter motorized incursions, enforcement difficulty, user confusion, and cross-boundary effects on the Nez Perce-Clearwater and Lolo National Forests.

257. The Revised Plan is arbitrary, capricious, and not in accordance with NEPA and must be set aside under the APA. 5 U.S.C. § 706(2)(A).

258. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## THIRD CLAIM FOR RELIEF

### The Failure to Designate Mountain Goats as a Species of Conservation Concern Violates NFMA

259. Plaintiffs incorporate by reference all preceding paragraphs.

260. The Forest Service is required to use the best available scientific information to designate Species of Conservation Concern. 36 C.F.R. §§ 219.3, 219.7(c)(3), 219.9(c).

261. The best available scientific information indicates that stressors to mountain goat capability to persist over the long-term include winter motorized use and climate change.

262. While the Forest Service may have limited ability to control the effects of climate change in this situation, it can control where winter motorized use occurs on the Forests.

263. The State of Idaho Department of Fish and Game expressed substantial concern regarding mountain goat capability to persist over the long-term on the Forests due to the stressors of winter motorized use and climate change.

264. The State of Montana Fish, Wildlife, and Parks expressed substantial concern regarding mountain goat capability to persist over the long-term on the Forests due to the stressors of winter motorized use and climate change.

265. The Forest Service expressed substantial concern regarding mountain goat capability to persist over the long-term due to the stressors of winter motorized use and climate change on the adjacent Lolo National Forest, specifically including the subpopulation shared by the Lolo and Nez Perce-Clearwater National Forests.

266. Given that the best available scientific information indicates that there is substantial concern regarding mountain goat capability to persist over the long-term on the Forests, the Forest Service should have designated mountain goats as a Species of Conservation Concern for the Revised Plan.

267. The failure to designate mountain goats as a Species of Conservation Concern is arbitrary, capricious, and not in accordance with NFMA and must be set aside under the APA. 5 U.S.C. § 706(2)(A).

268. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## FOURTH CLAIM FOR RELIEF

### The Failure to Use the Best Available Scientific Information for Wolverine and Mountain Goats in the Revised Plan Violates NFMA

269. Plaintiffs incorporate by reference all preceding paragraphs.

270. The 2012 Planning Rule requires the Forest Service to use the best available scientific information to inform the planning process. 36 C.F.R. § 219.3.

271. The Forest Service relied on the 2018 Wolverine SSA to conclude that proposed revised forest plan components addressed relevant stressors and that species-specific plan components were therefore unnecessary.

272. After reviewing twenty forest plans within the wolverine's current breeding range, FWS reported that it identified no wolverine-specific standards, found an overall lack of consistency across plans, and concluded that variability among forest-plan standards and conservation measures made it difficult to quantify coarse-filter benefits outside wilderness or characterize the effects of OSV travel management on wolverines.

273. The Revised Plan contains no wolverine-specific Standards or other plan components.

274. The Forest Service did not acknowledge the 2023 Wolverine SSA or explain why the Revised Plan's components nevertheless provide the ecological conditions necessary to contribute to wolverine recovery.

275. The best available scientific information also indicates substantial concern regarding mountain goats' capability to persist over the long term because of winter motorized disturbance, climate change, declining populations, small and isolated herds, and limited connectivity.

276. The same Regional Forester relied on those same stressors and scientific information to propose mountain goats, including populations that use the connected Great Burn landscape, as a Species of Conservation Concern on the adjacent Lolo National Forest but reached the opposite conclusion for the Nez Perce-Clearwater National Forests without a reasoned explanation.

277. The Forest Service's failure to use the best available scientific information in the Revised Plan was arbitrary, capricious, and not in accordance with NFMA and must be set aside under the APA. 5 U.S.C. § 706(2)(A).

278. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## FIFTH CLAIM FOR RELIEF

### The Failure to Develop Plan Components to Provide for the Diversity of Wildlife Species Violates NFMA

279. Plaintiffs incorporate by reference all preceding paragraphs.

280. The 2012 Planning Rule requires the Forest Service to develop plan components that maintain or restore the diversity of vegetation and ecosystems to provide for plant and animal species diversity. 36 C.F.R. §§ 219.8, 219.9.

281. Plan components that maintain or restore ecological integrity must take into account system drivers, disturbance regimes, stressors, connectivity, and conditions in the broader landscape. 36 C.F.R. § 219.8(a).

282. The 2012 Planning Rule requires the Forest Service to determine whether coarse-filter plan components provide the ecological conditions necessary to contribute to the recovery of wolverine and, if not, to adopt species-specific, fine-filter plan components that provide those conditions. 36 C.F.R. § 219.9(b)(1).

283. The Revised Plan's coarse-filter components do not provide the ecological conditions necessary to contribute to wolverine recovery because they leave substantial maternal and connectivity habitat exposed to the principal manageable stressor within the agency's control: motorized OSV use.

284. Because the Forest Service concluded without a reasoned basis that its coarse-filter components were sufficient to provide for wildlife diversity, it did not adopt fine-filter, species-specific plan components addressing wolverine maternal denning habitat, habitat connectivity, and winter motorized disturbance to wolverine.

285. Because the Forest Service failed to designate mountain goats as a Species of Conservation Concern, the Revised Plan does not include plan components addressing mountain goat habitat needs or the stressors that threaten the species' long-term persistence.

286. The Forest Service's failure to develop plan components that provide for wildlife diversity, maintain a viable mountain goat population, and provide the ecological conditions necessary to contribute to wolverine recovery was arbitrary, capricious, and not in accordance with NFMA and must be set aside under the APA. 5 U.S.C. § 706(2)(A).

287. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## PLAINTIFFS' REQUESTS FOR RELIEF

Plaintiffs respectfully request this Court:

A. Declare the Forest Service violated and continues to violate the law as alleged above;

B. Remand the Revised Plan to the Forest Service with instructions to comply with NEPA, NFMA, and the APA as alleged above;

C. Set aside and vacate relevant and appropriate portions of the Forest Service's decision approving the Revised Plan pending compliance with the law;

D. Enjoin implementation of the portions of the Revised Plan that the Court identifies as unlawful until Defendants have, to this Court's satisfaction, resolved the legal violations identified by the Court;

E. Issue any other relief, including preliminary or permanent injunctive relief that Plaintiffs may subsequently request;

F. Award Plaintiffs their costs of suit, reasonable expenses, and attorneys' fees; and

G. Grant Plaintiffs such other and further relief as the Court deems just and equitable.

//

//

Dated: October 20, 2026.

Respectfully submitted,

*/s/ Bryan Hurlbutt*
Bryan Hurlbutt (ISB # 8501)
Andrew Hursh (ISB # 12644)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 730-6961 (Hurlbutt)
(208) 268-5210 (Hursh)
bhurlbutt@advocateswest.org
ahursh@advocateswest.org

Susan Jane M. Brown (OSB #054607)
*Pro Hac Vice Admission Pending*
SILVIX RESOURCES
4107 NE Couch Street
Portland, OR 97232
(503) 680-5513
sjb@silvix.org

*Attorneys for Plaintiffs*